UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ASD SPECIALTY HEALTHCARE, LLC, <br><br> Plaintiff, <br><br> v. <br><br> COMMUNITY FIRST HEALTHCARE OF ILLINOIS, INC., <br><br> Defendant. | No. 21 C 06751 <br><br> Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

In this breach-of-contract case, Plaintiff ASD Specialty Healthcare, LLC ("ASD"), a pharmaceutical supply company, alleges that Defendant Community First Healthcare of Illinois, Inc. ("Community First"), which operates a hospital, bought certain COVID-19 treatment drugs from it and failed to pay. Community First admits that this is true but argues that it did not agree to the terms contained on ASD's invoices, including an 18% per annum late fee provision. ASD moves for summary judgment. For the following reasons, the Court grants that motion.

**BACKGROUND**

At the start of the COVID-19 pandemic in 2020, Community First began ordering the drug Veklury (also known as Remdesivir) on credit from ASD. Pl.'s Statement Material Facts, ECF 36 ¶ 5. ASD fulfilled and shipped the orders, and Community First accepted the shipments. *Id.* Community First did not sell the drug from its in-house pharmacy, but rather, used it to directly treat its patients who were admitted to the hospital with COVID-19. *Id.* ¶ 6; Def.'s Statement Add'l Material

1

Facts, ECF 43 ¶ 2. At the time, Remdesivir was one of the few drugs being used to treat COVID-19 patients. *Id.* ¶ 1.

ASD sent Community First over forty invoices for the Remdesivir it had ordered and accepted. R. 36 ¶¶ 5, 9; Am. Compl. Ex. A, R. 29-1 at 7–86. The invoices each contained a page of terms, including a provision that the invoices were governed by Pennsylvania law, that payment was due within 30 days from the date of the invoice, and that failure to pay could result in late fees of 1.5% per month or 18% per annum. R. 36 ¶¶ 10–12; R. 29-1 at 7–86. Community First never rejected or returned any shipments to ASD, nor did it communicate any objections to the invoices. R. 36 ¶¶ 7, 13; Def.'s Resp. to Pl.'s Statement Material Facts, ECF 42 ¶ 13.

As a result of government shutdowns and the general strain of the pandemic, Community First began experiencing cash flow issues during 2020 and 2021. R. 43 ¶ 3. Community First thus did not and could not pay all amounts invoiced by ASD within 30 days of the invoice dates. *Id.*; R. 36 ¶¶ 8, 14. On November 30, 2021, ASD sent an account statement to Community First showing over $418,000 due. *See* R. 29-1 at 3–5. Community First did not express any objections to the statement and has made some payments on the balance, but alleges it intended to pay only on the principal amounts and not on any late fees. R. 43 ¶ 4. As of November 14, 2022, ASD alleges that Community First owes it $484,167.26, which is the sum of $367,332 in principal and $116,835.26 in late fee interest. R. 36 ¶¶ 15–16. Community First disputes these amounts, alleging that there is no proof of an oral agreement as to the

price of the pharmaceuticals and that it never agreed to any late charges. R. 43 ¶¶ 15–16.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 2021 WL 4486445, at *1 (7th Cir. Oct. 1, 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

### I.  Choice of Law

As an initial matter, ASD argues that Pennsylvania law applies to the dispute because the invoices contain a Pennsylvania choice of law provision. Community

3

First, meanwhile, argues that Illinois law applies. Both Illinois and Pennsylvania have adopted identical versions of Article 2 of the Uniform Commercial Code ("UCC"). *Compare* 13 Pa. Const. Stat. §§ 2206–07 *and* 810 ILCS 5/2-206 and 5/2-207. In a case which turns on the application of the UCC, it does not matter which state's law applies so long as the disputed states have each adopted the UCC. *Northwest 1 Trucking Inc. v. Haro*, 2020 WL 1974379, at *10 (N.D. Ill. 2020) ("there is no choice-of-law problem because both states have adopted the Uniform Commercial Code"); *Ill. Wholesale Cash Register, Inc. v. PCG Trading, LLC*, 2008 WL 4924817, at *3 (N.D. Ill. Nov. 13, 2008) ("That the parties disagree on what state's law applies . . . matters not because both states have adopted Article 2 of the [UCC], which governs transactions involving the sale of goods.").

Community First argues that the choice-of-law question matters as to each state's interpretation and application of the UCC, and as to Count II (the claim for account stated), which is not governed by the UCC. Community First, however, does not articulate any substantive difference between Illinois and Pennsylvania laws, and ultimately, there is no meaningful distinction between the two states' laws which would lead to a different outcome in this case. But throughout this Opinion, the Court will generally assume for the sake of argument that Illinois law applies. Even so, and as discussed further below, Community First still cannot defeat ASD's motion for summary judgment.

## II. Breach of Contract

### A. Whether Community First is a Merchant Under the UCC

While the primary question here is whether a contract exists, the answer to that question depends on whether the UCC applies to the parties' relationship. Community First argues that the UCC does not apply to this dispute because it is not a merchant. Article 2 of the UCC applies to the sale of goods between merchants. 810 ILCS 5/2-102–103. A "merchant" is "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction." *Id.* § 2-104. Community First asserts that it is not a merchant because it is primarily a services provider, and the sale of goods is ancillary to its business.

The primary test to determine whether a party is merchant is not whether the party primarily provides services or goods to consumers, but whether the party "deals in goods of the kind" or "holds [its]self out as having knowledge or skill peculiar to the practices or goods involved in the transaction." *Id.* Because this broader definition applies to sections of the UCC which involve "normal business practices . . . typical of and familiar to any person in business," the definition encompasses "almost every person in business . . . . [B]anks or even universities, for example, well may be 'merchants,' so long as they are acting in their "mercantile capacity." *Id.* § 2-104, comment 2.

Community First, which operates a hospital and pharmacy, both deals in pharmaceuticals and holds itself out as having knowledge and skills particular to

5

using those pharmaceuticals to treat people who are ill. Though it is a services provider to its patients, Community First was acting in its "mercantile capacity" when it entered the contracts at issue for the purchase of goods which are fundamental to its business. *Id.*; *see also Ardus Med., Inc. v. Emanuel Cnty. Hosp. Auth.*, 558 F. Supp. 2d 1301, 1307 n.7 (S.D. Ga. 2008) (noting that a hospital was a merchant under the UCC as to a contract for the purchase of medical equipment from a pharmaceutical supplier). If Community First's argument were true, any business that regularly buys goods that it then uses to provide services to consumers would not be a merchant.[1]

The cases cited by Community First stand for the principle that the UCC does not apply to dealings between a hospital and its patients because these contracts primarily involve the exchange of services, and any good provided to the patient (i.e., a pharmaceutical or medical device) is ancillary to those services. *In re Breast Implant Prod. Liab. Litig.*, 331 S.C. 540, 553 (1998) (health care providers who use products during the course of providing treatment to patients are providing "services," such that the UCC is inapplicable); *Pitler v. Michael Reese Hospital*, 92 Ill. App. 3d 739, 749 (1980) (UCC did not apply to a contract for providing radiation treatment to a patient because it was primarily for the rendition of services); *Cook v. Downing*, 891 P.2d 611, 612 (Okla. App. Ct. 1994) (UCC did not govern the provision

---

[1] For example, a restaurant purchases produce from a supplier and then uses that produce to provide a mix of goods (meals) and services (wait staff) to its customers. While the UCC would not apply to the restaurant's dealings with its customers, comment 2 to § 2-104 is clear that the restaurant is a merchant for purposes of a sales contract with its produce supplier.

6

of dentures to a patient by a dentist).² These cases, however, did not address whether the hospitals were merchants. Instead, the UCC was inapplicable in these cases because the contracts were for services, and not the sale of goods. Here, by contrast, the contract at issue is purely for the sale of goods (not services) between two entities acting in their "mercantile capacities." The UCC therefore applies.

### B. Existence of a Contract

Community First next argues that there is an issue of material fact as to whether an oral contract was formed and whether the additional terms on the invoices were incorporated into the contract. Under the UCC:

> Unless otherwise unambiguously indicated by the language or circumstances . . . an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or nonconforming goods.

810 ILCS 5/2-206. And when, as in the current case, the accepting party sends a "definite and seasonable expression of acceptance or written confirmation," like an invoice, within a reasonable time, it operates as an acceptance even when that writing contains additional or different terms. *Id.* § 2-207(1). Between merchants, these additional terms "become part of the contract" except in three circumstances: (1) "when the offer expressly limits acceptance to the terms of the offer;" (2) when the

---

² *Garcia v. Edgewater Hospital*, 244. Ill. App. 3d 894 (1993) is also completely inapposite. The court there held that the UCC did not apply to an action in tort, which this is not. And the court in *Forms World of Illinois, Inc. v. Magna Bank, N.A.*, 334 Ill. App. 3d 1107, 1112–13 (2002) merely found that a bank is not a merchant of "consumer forms and printing" because it did not hold itself out as an expert on such matters. Conversely, Community First holds itself out as an expert in the use of pharmaceuticals to treat patients.

7

additional terms "materially alter" the contract; or (3) when the offeror notifies the opposing party of its objection to the additional terms within a reasonable time. *Id.* § 2-207(2).

Here, contrary to Community First's assertions, the undisputed facts establish mutual assent to the purchase of Remdesivir and the terms of the agreement. Community First's requests for purchasing Remdesivir from ASD on credit were offers; ASD's prompt shipment of the Remdesivir to Community First, along with invoices, manifested its acceptance of the offers. *Id.* § 2-206. And though the invoices contained additional terms, Community First did not need to expressly agree to them. Because there was no express requirement that the acceptance match the terms of the offer, the additional terms became a part of the contract unless Community First objected within a reasonable time (it admits it did not) or the terms materially altered the contract. *Id.* § 2-207. Community First therefore argues that the 18% per annum late fee provision materially alters the contract and is not part of it.

### i. Whether the Late Fee Provision Materially Alters the Contract

A material alteration exists if it "result[s] in surprise or hardship if incorporated without express awareness by the other party." *Id.* § 2-207, comment 4; *Trans-Aire Int'l, Inc. v. N. Adhesive Co.*, 882 F.2d 1254, 1260 (7th Cir. 1989). Whether a term materially alters a contract is typically an issue of fact, however, "summary judgment may be appropriate when the parties cannot honestly dispute that a term would result in surprise or undue hardship unless both parties agree to its inclusion."

8

*Id.* at 1261 (citing *Clifford-Jacobs Forging Co. v. Capital Eng. & Mfg. Co.*, 437 N.E.2d 22, 25 (Ill. App. Ct. 1982)).

The UCC comments expressly state that "a clause providing for interest on overdue invoices . . . where [the terms] are within the range of trade practice" "involve[s] no element of unreasonable surprise and . . . therefore [is] to be incorporated in the contract." 810 ILCS 5/2-207, comment 5. The late fee provision here is clearly encompassed by this language. Additionally, Community First has pointed to no evidence that charging 18% interest on late payments is outside the range of trade practice or unreasonably surprising to sophisticated actors. Indeed, in *Extel Corp. v. Cermetek Microelectronics, Inc.*, 183 Ill. App. 3d 688, 692-93 (1989), an Illinois Appellate Court held on summary judgment that an identical 18% per annum late fee provision contained in an invoice was not a material alteration of an oral purchase contract and was to be incorporated in the contract. *Id.* (citing 810 ILCS 5/2-207, comment 5).

Community First maintains that, under the circumstances, the late fee provision resulted in unreasonable surprise because it was contained in a page of fine print. But contrary to Community First's assertions, the invoices do not contain such a large amount of fine print so as to result in unreasonable surprise. Community First, a sophisticated actor, cannot have been surprised by a <u>single</u> page of terms. *See, e.g.*, R. 29-1 at 8. This argument is further undermined by the fact that, on the front of most of the invoices, ASD calculated the amounts owing by multiplying

9

outstanding amounts by an explicit 18% interest rate. *See, e.g.*, R. 29-1 at 13, 15, 17, 19.

Community First finally argues that the 18% interest provision creates an unreasonable hardship because it cannot afford to pay it and because it is a struggling community hospital with cash flow problems due to the pandemic. But a subsequent inability to pay after entering a contract is not the kind of hardship that makes a late fee contractual provision unenforceable. If this were so, any late fee provision contained on an invoice would always be unenforceable, because a party that is late making payments is almost always suffering some sort of financial hardship. Thus, the 18% per annum late fee provision is incorporated in the parties' contract as a matter of law.[3]

## III. Account Stated

ASD next seeks summary judgment on Count II for an account stated. An account stated is a theory for proving damages on "the breach of a promise to pay on a contract." *Dreyer Med. Clinic, S.C. v. Corral*, 591 N.E.2d 111, 114 (Ill. App. Ct. 1992). To establish an account stated, the plaintiff needs to prove that it rendered

---

[3] Community First also argues that the invoice terms are invalid because some of the other provisions would, by themselves, materially alter the contract. For example, there are clauses negating the standard warranties. *See Album Graphics, Inc. v. Beatrice Foods Co.*, 408 N.E.2d 1041, (Ill. App. Ct. 1980) ("A term disclaiming warranties . . . is undoubtedly a term that materially alters a contract."). But ASD is not seeking to enforce those other terms. Even if it were and the Court found that those provisions were unenforceable, the invoice contains a severability clause. *See* R. 29-1 at 8. This weighs strongly in favor of the Court severing any unenforceable provisions that are not essential to the contract and enforcing the rest. *See Abbott-Interfast Corp. v. Harkabus*, 619 N.E.2d 1337, 1343-44 (Ill. App. Ct. 1993).

10

upon another party a running account of balances due, and that the other party expressly or impliedly agreed that the account is true and correct and promised that it will pay the balance. *Brad Foot Gear Works, Inc. v. Delta Brands, Inc.*, 332 F. Supp. 2d 1123, 1125 (N.D. Ill. 2004) (quoting *W.E. Erickson Const., Inc. v. Congress-Kenilworth Corp.*, 477 N.E.2d 513, 519 (Ill. App. Ct. 1985)). "This agreement is often formed by one party submitting a statement of account to another, who retains the account beyond a reasonable time without objection. . . . A failure to object to the account statement is viewed as a recognition of its accuracy." *Brad Foot Gear Works*, 332 F. Supp. 2d at 1125 (citations omitted).

ASD is entitled to summary judgment on its account stated claim. This Court has already found that Community First is liable to ASD under a valid contract. ASD sent many invoices to Community First during the course of their dealings, as well as an account statement on November 30, 2021 listing all amounts due. Community First now attempts in this litigation to create an issue of material fact by disagreeing with the amounts due and objecting to all interest owed. R. 42 ¶¶ 15–17. But this does not serve as an objection within a reasonable period of time to the statements of account offered by ASD. And Community First provides no evidence that it objected to ASD's accounting within a reasonable time. Rather, Community First admits that, prior to this lawsuit, it never expressed any objection to the account statement that it received from ASD, and actually made some payments on its debt. *Id.* ¶ 13; R. 43 ¶ 4. Thus, the account stated establishes the amount of debt Community First owed under the contracts for the purchase of Remdesivir as of November 30, 2021. Any

amount due under this count is already included in the breach of contract award and is not in addition to that award. *ITQ Lata, LLC v. MB Fin. Bank, N.A.*, 317 F. Supp. 2d 844, 859 (N.D. Ill. 2004).

## CONCLUSION

For the foregoing reasons, ASD's motion for summary judgment (R. 35) is granted in full. There is no material dispute to the affidavit and calculations prepared by Jael Pleis, ASD Accounts Receivable Specialist, which shows Community First owed $484,167.26 in principal and interest as of November 15, 2022. Therefore, judgment is entered against Community First in the amount of $484,167.26 plus interest running from November 15, 2022 to the date of this Order.

ENTERED:

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: February 2, 2023